AO 106 (Rev. 04/10)  Application for a Search Warrant

E-FILED
Thursday, 20 June, 2019  04:47:11 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

### for the
### Central District of Illinois

FILED

JUN 2 0 2019

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 19-MJ-7124 |
| The Cellular Telephone Assigned Call Number (662) 715-9408 | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, which is attached hereto and incorporated by reference. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ Unknown _____ District of _____ Unknown _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute |

The application is based on these facts:
See Agent Luke Edson's affidavit in support of the search warrant. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by the Drug Enforcement Agency.

- ☐ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Luke Edson

_____
*Applicant's signature*

DEA Special Agent Luke Edson
*Printed name and title*

Sworn to before me and signed in my presence.          s/Eric I Long

Date: _____06/20/2019_____

_____
*Judge's signature*

City and state:  Urbana, Illinois          Eric I. Long, United States Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (662) 715-9408 | Case No. 19-MJ-7124<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A SEARCH WARRANT**

I, Luke Edson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(l)(A) for information about the location of the cellular telephone assigned call number 662-715-9408 (the "Target Cell Phone"), subscribed to John Doe, PO Box 15955, Lenexa, KS, and believed to be utilized by David Marshall, whose service provider is Sprint, a wireless telephone service provider headquartered at 6200 Sprint Parkway, Overland Park, KS 6625l. This phone's account information was last subpoenaed on June 17, 2019, and received back on the same day.  The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.    Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions

of information collected by a "pen-register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) and (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* U.S.C. § 3123(b)(1).

3.      I, Luke Edson, am a Special Agent of the Drug Enforcement Administration (DEA) and have been for nearly 3 years. I am presently assigned to the Springfield, Illinois, Resident Office. I have received specialized training in various aspects of narcotics investigations, which include, but are not limited to individuals and organizations deriving income from the unlawful distribution of controlled substances. I have had hundreds of conversations with drug traffickers concerning their methods of operation in the course of investigative interviews and covert activities. I have also participated in the execution of numerous search warrants relating to illegal drug trafficking.

4.      Based on my experience, I am familiar with the methods used in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations.  I am knowledgeable of the methods and modes of narcotics operations and the language and patterns of narcotics abuse and trafficking.  I am familiar with the methods of operation typically used by narcotics traffickers, including common forms of communication utilized by such persons.  I have been involved in previous investigations that utilized pen register/trap and trace devices and am familiar with the information that may be learned from analysis of the data they provide.  Based on

your affiant's law enforcement experience, participation in the investigation of narcotics organizations, and conversations with other agents of the DEA familiar with the narcotics trafficking and money laundering matters, your affiant has a clear understanding of the methods used by narcotics trafficking organizations.

5.      I am familiar with the below-listed facts based on my own personal investigation, the investigation of other law enforcement officers, or information officially furnished to me by other law enforcement officers, witnesses, or confidential sources.  This affidavit does not include all facts pertaining to this investigation, but is intended merely to establish probable cause for the requested warrant.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. § 841(a)(1), have been committed, are being committed, and will be committed by the main target of the investigation, David Marshall and others as yet unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

7.      This court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.  *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8.      The United States, including the Drug Enforcement Administration

(DEA), your affiant officer, and members of the Decatur Police Department (DPD), is conducting a criminal investigation of David Marshall. The investigation was initiated in the summer of 2018, when Marshall was identified as a large quantity cocaine and heroin distributor in the Decatur, Illinois, area.

## Confidential Source Information

9.     The confidential sources ("CS") involved in this investigation have provided several reliable, confirmed facts of information during a separate investigations and had their information independently corroborated.

10.     CS # 1 has a prior arrest and conviction for narcotics trafficking in 2001 and subsequently served a term of imprisonment.  CS# 1 is currently in custody and is pending revocation on the above-described narcotics case. CS# 1 also had a prior violation resulting in a revocation and a term of imprisonment.  CS# 1 will not receive consideration towards his revocation for cooperation. However, CS# 1 was cooperating in this investigation for consideration in an ongoing investigation in which formal charges have been filed.  Additionally, CS# 1 has prior convictions for retail theft and various traffic offenses.

11.     CS # 2 has been convicted of seven drug-related felonies, two weapons offenses, and two traffic offenses. CS # 2 is cooperating in this investigation for consideration in an ongoing investigation in which no formal charges have been filed at this time.  Additionally, CS # 2 has received financial compensation from DPD

## January and February 2019

12.     In January of 2019, your affiant and another DEA agent met with CS# 1.

During this meeting, CS# 1 informed DEA agents that he/she had purchased cocaine

from MARSHALL on different occasions in 2018. CS# 1 stated MARSHALL was also

a distributor heroin and cannabis. CS# 1 stated he/she had a contact phone number of

(469) 315-5183 for MARSHALL.  This phone number was known by investigators to

be utilized by MARSHALL prior to meeting with CS# 1. CS# 1 also identified a

photograph known to investigators as MARSHALL.

13.     During the months of January and February of 2019, CS# 1 met with

MARSHALL on multiple occasions in Decatur, Illinois, at a public place. These

meetings were under the direction and surveillance of your affiant and investigators.

During the meetings, which were audio/video recorded, MARSHALL and CS# 1

discussed cocaine and heroin sales. CS# 1 and MARSHALL also exchanged phone

numbers in order to be able to make arrangements for the future purchase of cocaine

and heroin.

14.     Additionally, MARSHALL placed multiple phone calls to CS# 1 using

(469) 315-5183 and other numbers, including the phone number (217) 848-7886

(known to be utilized by Van CUNNINGHAM). During these phone conversations,

which were recorded, Marshall and CS# 1 made arrangements to meet in Decatur,

Illinois, where cocaine would be bought and sold.

### Controlled Purchase 1 by CS # 1

15.     On February 21, 2019, CS# 1 conducted a controlled purchase of cocaine

from David MARSHALL. Prior to the controlled purchase, MARSHALL was in

contact with CS# 1 utilizing  V. CUNNINGHAM's phone number (217) 848-7886.

Marshall also contacted CS# 1 following the controlled purchase using the phone number (469) 315-5183.

16.     CS# 1 and CS# 1's vehicle had been searched for contraband prior to and after meeting with MARSHALL in Decatur, Illinois, by investigators. No contraband was found during the searches by investigators. CS# 1 was also issued Official Advanced Funds (OAF) to purchase cocaine and audio/video equipment to record the controlled purchase by investigators. During this controlled purchase, CS# 1 bought an amount of suspected cocaine (field tested positive) utilizing the OAF that was issued to him/her by investigators. This substance was subsequently analyzed by a DEA laboratory and returned a positive result for cocaine. During this purchase, investigators identified MARSHALL as a passenger in a Nissan Versa with Missouri Registration MR6V2R. This vehicle was found to be a Hertz rental car, which was rented in MARSHALL's name, via subpoena that was issued on February 19, 2019, and returned on February 21, 2019. MARSHALL was identified by investigators coming and going from the controlled purchase in the Nissan Versa. Additionally, Van Cunningham (B/M; DOB: 05-17-1956) was identified as the driver of the Versa. V. Cunningham was present and participated in the controlled purchase. Marshall and V. Cunningham were also identified by investigators on audio/video recording(s) during the controlled purchase.

## Controlled Purchase 2 by CS #1

17.     On February 27, 2019, CS# 1 conducted a controlled purchase of cocaine from David MARSHALL. Prior to the controlled purchase, MARSHALL was in

contact with CS# 1 utilizing phone number (469) 315-5183.

18.     CS# 1 and CS# 1's vehicle had been searched for contraband prior to and after meeting with Marshall in Decatur, Illinois, by investigators. No contraband was found during the searches by investigators. CS# 1 was also issued Official Advanced Funds (OAF) to purchase cocaine and audio/video equipment to record the controlled purchase by investigators. During this controlled purchase, CS# 1 bought an amount of suspected cocaine (field tested positive) from MARSHALL utilizing the OAF that was issued to him/her by investigators. This substance was subsequently analyzed by a DEA laboratory and returned a positive result for cocaine. During this purchase, investigators identified MARSHALL as a passenger in a tan GMC Acadia. Additionally, Van CUNNINGHAM was identified by investigators as the driver of a gray Jeep rental vehicle that left the buy location with MARSHALL and the Acadia. MARSHALL was also identified by investigators on audio/video recording(s) during the controlled purchase.

### March 2019 Traffic Stop

19.     On March 11, 2019, your affiant obtained a federal search warrant regarding the cellular telephone assigned call number 217-848-7886.

20.     On March 17, 2019, investigators were electronically monitoring an electronic device known to be utilized by Van CUNNINGHAM.  Based upon this electronic surveillance, investigators believed that Van CUNNINGHAM was departing Decatur, Illinois, and traveling to Chicago, Illinois, in order to obtain narcotics at the direction of MARSHALL.

21.     Investigators continued to monitor the electronic device, which eventually stopped near the intersection of East 105th Street and South Indiana Avenue, in Chicago, Illinois. After approximately 45 minutes, investigators observed the location of the device moving south from Chicago. Due to the information obtained during this investigation, investigators believed the cellular phone, and therefore V. Cunningham, was likely traveling back to Decatur, Illinois.

22.     At approximately 1:17 p.m., Macon County (Illinois) law enforcement officers initiated a traffic stop on a silver Ford 500 (Illinois license plate AS60290) for traffic violations in Decatur, Illinois. Macon County law enforcement officers identified Van CUNNINGHAM as the driver and Robert BARBEE as a passenger.  V. CUNNINGHAM was found by law enforcement officers to have an expired driver's license.

23.     During the traffic stop, Detective Hunt deployed his K-9 "Maco" to conduct a free air sniff of the vehicle. Detective Hunt's K-9 alerted to the presence of illicit drug odor(s).  Prior to law enforcement officers conducting a probable cause search of the vehicle, they spoke with BARBEE outside of the vehicle.

24.     While law enforcement officers were speaking with BARBEE, BARBEE stated there were narcotics in a jacket in the back seat of the vehicle.  BARBEE denied ownership of the jacket and stated it belonged to Van CUNNINGHAM.  BARBEE and Van CUNNINGHAM both had cellular devices, which were seized by law enforcement officers. Van CUNNINGHAM was in possession of a black ZTE cellular phone..  BARBEE was in possession of a Coolpad cellular phone.

25.     A subsequent search of the vehicle revealed approximately 9 ounces of suspected cocaine. This substance was subsequently analyzed by a DEA laboratory and returned a positive result for cocaine. BARBEE and V. CUNNINGHAM were detained by law enforcement at the traffic stop and transported to Decatur Police Department for an interview.

26.     At DPD, Van CUNNINGHAM requested an attorney and no questioning took place.  Law enforcement officers informed Van CUNNINGHAM his cellular device was being seized.

27.     BARBEE, who had been advised of his Miranda Rights by law enforcement officers, agreed to make a statement.  BARBEE stated on March 16, 2019, Van CUNNINGHAM asked for a ride to Chicago, Illinois.  BARBEE said he agreed to take Van CUNNINGHAM on March 17, 2019.  BARBEE stated once they arrived in Chicago, Illinois, Van CUNNINGHAM went into an apartment for approximately 20 minutes.  BARBEE indicated he was unsure of where the apartment was located and did not know anyone in the area where they stopped.  BARBEE said when Van CUNNINGHAM left the apartment that they left and began traveling back to Decatur, Illinois.  BARBEE said they were later traffic stopped by law enforcement. BARBEE stated he had no knowledge of the purpose of the trip.  BARBEE stated he had known Van CUNNINGHAM for 50 years.

28.     Additionally, BARBEE consented to a search of his cellular device and completed a consent to search waiver form. A full forensic analysis of the phone is pending.  However, the call log in BARBEE's phone revealed approximately 6

communications with MARSHALL's phone number of (469) 315-5183 and approximately 3 communications with Van CUNNINGHAM's phone number of 217-848-7886 on the day of the traffic stop.  BARBEE informed investigators that his phone number was "775-5454."  BARBEE also had phone a contact of "BC" with the phone number of (314) 354-4903.  Investigators know "BC" to be Brian CUNNINGHAM. BARBEE's phone was returned to him following the forensic download.

29.    BARBEE's phone was also found to have an outgoing phone call to (773) 454-7735 during the traffic stop.  Subpoenaed toll records for this phone number revealed this phone's top contacts were consistent with phone numbers known to be associated with MARSHALL.

### Controlled Purchase 1 by CS #2

30.    On or about April 11, 2019, CS # 2 conducted a controlled purchase of cocaine and cocaine base from Brian CUNNINGHAM and JOHNSON.  During this controlled purchase, CS# 2 bought one ounce of cocaine and one ounce of cocaine base (field tested positive/lab analysis confirmed both substances to test positive for cocaine and cocaine base) utilizing the OAF that was issued to him/her by investigators. During this purchase, investigators identified JOHNSON and Brian CUNNINGHAM as the subjects who sold the cocaine and cocaine base to CS # 2.

31.    CS # 2, and CS # 2's vehicle were searched for contraband by investigators prior to and after the controlled purchase with Brian CUNNINGHAM and JOHNSON at 1104 East Garfield Avenue in Decatur, Illinois. Investigators also issued CS # 2 Official Advanced Funds (OAF) to purchase cocaine and cocaine base,

along with audio/video equipment to record the controlled purchase.

32.     Moments after the CS parked his/her vehicle to the west of the residence, a dark blue Hyundai displaying arrived and parked north of CS #2's vehicle. A black male wearing a white shirt and gray hat exited the front right passenger seat and started walking towards the rear of the residence. Your affiant and another investigator identified the black male as MARSHALL. MARSHALL was observed, via electronic surveillance, using a cellular phone while he walked towards the residence.

33.     CS # 2 exited the CS vehicle and walked to the rear of the residence. CS # 2 waited at the rear door with MARSHALL. MARSHALL was observed on audio/video using a cellular phone, which was on speaker.

34.     CS # 2 asked MARSHALL if Brian CUNNINGHAM was home. MARSHALL responded no. MARSHALL asked the person on the phone, whose voice sounded to be that of Brian CUNNINGHAM, how he made it to his (Brian CUNNINGHAM) location. MARSHALL then tells the male voice on the phone "Ok, come on man, we sittin' in front of yo crib."

35.     While CS # 2 was inside of the residence, MARSHALL and Brian CUNNINGHAM conversed about Van CUNNINGHAM.  MARSHALL and Brian CUNNINGHAM talked about how they believed law enforcement was watching Van CUNNINGHAM (because of the March 17, 2019, traffic stop).  MARSHALL stated he was not going to call Van CUNNINGHAM's phone, but would visit him only at night.

36.     After MARSHALL left the residence, Brian CUNNINGHAM mentioned

that Van CUNNINGHAM (who B. CUNNINGHAM referred to as "Uncle/Unc") was still making trips for cocaine.  B. CUNNINGHAM stated his "Uncle" had made a trip the day prior, and had brought him 2 zips (2 ounces) as soon as he had it.

37.     At approximately 5:08 p.m. on the same date of April 11, 2019, Brian CUNNINGHAM is observed on audio/video utilizing a cellular phone.  It appeared that Brian CUNNINGHAM had placed the cellular phone on speaker, as ringing could be heard along with a male voice that answered. Brian CUNNINGHAM and a male voice on the other end of the phone call could be heard conversing. Brian CUNNINGHAM told the person on the phone that he needed to holler at him a couple times. Brian CUNNINGHAM stated his guy/girl (referring to CS #2) was with him. The male voice could be heard asking Brian CUNNINGHAM if his person needed it right now. Brian CUNNINGHAM informed the male on the phone that CS # 2 did. Brian CUNNINGHAM said that CS # 2 wanted them "done." The male voice on the phone responded that he had "1 and 1" (Your affiant believes this was a reference to one ounce of cocaine and one ounce of cocaine base).

38.     Toll analysis of Brian CUNNINGHAM's phone indicated there was an outbound call from (217) 451-1366 (utilized by Brian CUNNINGHAM) to (217) 848-1006 (JOHNSON) at approximately 5:08 p.m. on April 11, 2019.  Investigators later learned that JOHNSON was involved in an accident prior to this controlled purchase in the black Chevy Tahoe with Illinois license plate AC1 7324. JOHNSON was listed on the DPD report as the driver of the vehicle along with a contact phone number of (217) 848-1006. After this phone call ends, Brian CUNNINGHAM is observed holding

a phone up to his face and initiating another phone call.

39.     Toll analysis on B. CUNNINGHAM's phone indicated there was a communication between B. CUNNINGHAM's phone number of 314-354-4903 and MARSHALL's suspected phone number of 662-715-9408 at approximately 5:10 p.m. on April 11, 2019. On the audio/video recording from CS #2, Brian CUNNINGHAM can be heard stating hello. There is a pause and then Brian CUNNINGHAM states "he gone." Due to the timing and content of this call, it is believed that Brian CUNNINGHAM was informing MARSHALL that CS #2 had left the residence so MARSHALL would not return, because MARSHALL did not have cocaine base readily available like JOHNSON. It is believed Brian CUNNINGHAM did this to avoid having MARSHALL and JOHNSON both arrive at the residence with cocaine.

40.     CS # 2 was later observed via electronic surveillance exiting the residence and entering the CS vehicle. CS # 2 then drove away from the residence and stopped the vehicle at a public area. Investigators maintained continuous surveillance of CS # 2, while CS # 2 waited nearby. CS # 2 did not exit the vehicle or meet with anyone while waiting. While CS # 2 was traveling to the public area to wait, he/she informed investigators electronically that Brian CUNNINGHAM had canceled the order from the "Big dude" (referring to MARSHALL). CS # 2 stated Brian CUNNINGHAM said the "Big Dude" had lower quality cocaine than the other source. CS # 2 said another person was going to bring the cocaine. CS # 2 said Brian CUNNINGHAM asked him/her to leave so MARSHALL did not see him/her at the house, because then they would have to buy MARSHALL's product.

41.     CS # 2 later returned to 1104 East Garfield, in Decatur, Illinois. CS #2 exited the CS vehicle and entered the rear of the residence.  Moments later, investigators observed a black Chevrolet Tahoe with Illinois license plate AC1 7324 traveling eastbound on Garfield Avenue approaching Illinois Street. Your affiant and another investigator then observed the black Chevy Tahoe arrive at the residence and park in front of the CS vehicle, via electronic surveillance.

42.     Your affiant and another investigator identified JOHNSON exiting the driver's seat of the Chevrolet Tahoe, via electronic surveillance.  Your affiant and another investigator observed JOHNSON walk to the rear of the residence. Investigators heard a knock at the door on the audio/video recordings.  Brian CUNNINGHAM then stated "Come on in." JOHNSON was then observed walking inside.

43.     JOHNSON and Brian CUNNINGHAM were then observed and heard via electronic surveillance conversing as they walked into an adjacent room from CS # 2. After a few minutes, JOHNSON and Brian CUNNINGHAM were then observed walking back into the room near the rear door where CS # 2 was waiting. CS # 2 stated that he/she was provided with approximately one ounce of cocaine and one ounce of cocaine base by Brian CUNNINGHAM when they (Brian CUNNINGHAM and JOHNSON) came out of the adjacent room. Brian CUNNINGHAM, JOHNSON, and CS # 2 then exited the rear door. Brian CUNNINGHAM and JOHNSON were observed conversing as CS # 2 walked to the CS vehicle.

44.     CS # 2 was observed entering the CS vehicle and leaving the area under

the continuous surveillance of investigators. CS # 2 then drove back to the PAL to meet with your affiant and another investigator.

45.    JOHNSON later entered the driver's seat of the black Chevy Tahoe and drove away. Surveillance units then followed JOHNSON away from the residence. Surveillance was later terminated on JOHNSON.

### Phone Number Change by MARSHALL

46.    Subpoenaed tolls from Brian CUNNINGHAM's phones (314-354-4903 and 217-451-1366) were analyzed following the April controlled purchase conducted by CS #2.  The toll analysis showed the target phone number of (662) 715-9408 in contact with B. CUNNINGHAM's phone number of (314) 544-4903 at the same approximate time on April 11, 2019, that officers had observed via audio/video recording that MARSHALL was on his phone speaking to a voice identified as B. CUNNINGHAM. As a result, investigators believe MARSHALL was utilizing phone number (662) 715-9408 in April 2019.

47.    A subpoena that was then issued for (662) 715-9408.  Analysis of this phone indicated this phone number was activated on March 19, 2019, two days after the traffic stop of Van CUNNINGHAM and Robert BARBEE on March 17, 2019, in Decatur, Illinois.  The day of the traffic stop, (March 17, 2019), MARSHALL's phone number of (469) 315-5183, had been in contact with Robert BARBEE (217-775-5454) and Van CUNNINGHAM (217-848-7886). However, MARSHALL's last communication using this phone number of (469) 315-5183 occurred during the late evening hours on March 17, 2019.  Based on this, investigators believe that

MARSHALL stopped utilizing this phone number after learning of the traffic stop and to avoid law enforcement investigation and apprehension.

48.      Furthermore,  subpoena information show the target phone number of (662) 715-9408, which is believed to be MARHSALL's new phone number, was activated on March 19, 2019, under the same account that had held MARSHALL's previously-used phone number of (469) 315-5183. This account number is 688031779 with service by Sprint.

## Toll Analysis

49.      Toll analysis revealed the target phone number of (662) 715-9408 had approximately 242 communications with Brian CUNNINGHAM's phone number of (217) 451-1366 between March 19, 2019, and June 16, 2019.  The phone number of (662) 715-9408 had approximately 139 communications with Brian CUNNINGHAM's phone number of (314) 354-4903 between March 23, 2019, and June 10, 2019.

## Cellular Phone Information

50.      Based on my training and experience, I know that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of drug proceeds. I know that professional narcotics operations depend on maintaining their extensive contacts.  The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers.  The telephone enables narcotics dealers to maintain contact with

narcotics associates, suppliers, and customers. As such, persons involved in narcotics trafficking regularly carry their cellular phones on their persons when engaging in narcotics sales.

51. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/ face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart in urban areas; and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

52. Based on my training and experience, I know Sprint can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a

signal to determine the location of the Target Cell Phone on Sprint's network or
with such other reference points as may be reasonably available.

53.     Based on my training and experience, I know that Sprint can collect
cell-site data about the Target Cell Phone. I also am aware that for each
communication a cellular device makes, its wireless service provider can typically
determine: (1) the date and time of the communication; (2) the telephone numbers
involved, if any; (3) the cell tower to which the customer connected at the beginning
of the communication; (4) the cell tower to which the customer connected at the end
of the communication; and (5) the duration of the communication.  I also know that
wireless providers such as Sprint typically collect and retain cell-site data pertaining
to cellular devices to which they provide service in their normal course of business in
order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

54.     Based upon the foregoing, I request that the Court issue the proposed
search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C.
§2703(c).

55.     Pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal
Procedure 41(f)(3), your Affiant requests that the Court authorize the officer
executing the warrant to delay notice until 30 days after the collection authorized
by the warrant has been  completed. There is reasonable cause to believe that
providing immediate notification of  the warrant may have an adverse result, as
defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user

of the "Target Cell Phone" would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

56.     I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Target Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

57.     I further request that the Court authorize execution of the warrant at

any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

58.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted.

s/Luke Edson

_____

Luke Edson, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this _____ day of June 2019.

s/Eric I Long

_____

The Honorable Eric I. Long
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1.    The cellular telephone number assigned call number (662) 715-9408 (the "Target Cell Phone"), whose service provider is Sprint, a wireless telephone service provider headquartered at 6200 Sprint Parkway, Overland Park, KS 66251.

2.    Records and information associated with the target cell phone that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to Be Seized

I.     **Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in
Attachment A for a period of sixty days, during all times of day and night.
"Information about the location of the Target Cell Phone" includes all available E-911
Phase II data, GPS data, latitude and longitude data, and other precise location
information, as well as all data about which "cell towers" (i.e., antenna towers
covering specific geographical areas) and "sectors" (i.e., faces of the towers) received a
radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph
(hereinafter, "Location Information") is within the possession, custody, or control of
Sprint is required to disclose the Location Information to the government. In addition,
Sprint must furnish the government all information, facilities, and technical assistance
necessary to accomplish the collection of the Location Information unobtrusively and
with a minimum of interference with Sprint services, including by initiating a signal to
determine the location of the Target Cell Phone on Sprint network or with such other
reference points as may be reasonably available, and at such intervals and times
directed by the government. The government shall compensate Sprint for reasonable
expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In
approving this warrant, the Court finds reasonable necessity for the seizure of the

Location Information.  *See* 18 U.S.C. § 3103a (b)(2).

**II.     Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) involving David Marshall and other known and unknown subjects.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in the investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.